**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| KEITH ROGERS, derivatively on behalf of AEROVIRONMENT, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>WAHID NAWABI, KEVIN P. MCDONNELL, MARY CLUM, HENRY H. ALBERS, CHARLES THOMAS BURBAGE, PHILIP S. DAVIDSON, CINDY K. LEWIS, MARY BETH LONG, EDWARD R. MULLER, STEPHEN F. PAGE, JOSEPH L. VOTEL, and DAVID WODLINGER,<br><br>Defendants,<br><br>and<br><br>AEROVIRONMENT, INC.,<br><br>Nominal Defendant. | Case No.: **1:26-cv-2284**<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Keith Rogers ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant AeroVironment, Inc. ("AeroVironment" or the "Company"), files this Verified Shareholder Derivative Complaint against Wahid Nawabi ("Nawabi"), Kevin P. McDonnell ("McDonnell"), Mary Clum ("Clum"), Henry H. Albers ("Albers"), Charles Thomas Burbage ("Burbage"), Philip S. Davidson ("Davidson"), Cindy K. Lewis ("Lewis"), Mary Beth Long ("Long"), Edward R. Muller ("Muller"), Stephen F. Page ("Page"), Joseph L. Votel ("Votel"), and David Wodlinger ("Wodlinger") (collectively, the "Individual Defendants" and together with AeroVironment, the "Defendants") for breaches of their fiduciary duties as directors

and/or officers of AeroVironment, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Nawabi, McDonnell, and Clum for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding AeroVironment, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by AeroVironment's current and/or former officers and directors from June 25, 2025 to June 22, 2026, both dates inclusive (the "Relevant Period").

2. AeroVironment is a defense technology provider focused on developing and deploying products in two reportable segments: (1) Autonomous Systems, such as aircraft systems, precision strikes, and counter-UAS technologies, and (2) Space, Cyber and Directed Energy, such as beamforming technology, phased array antenna technology, and space-qualified hardware.

3. In May 2025, AeroVironment acquired BlueHalo, LLC ("BlueHalo"), a defense technology firm that specialized in advanced engineering products. Prior to the acquisition, BlueHalo was awarded a $1.4 billion contract, which was subsequently increased to $1.7 billion,

with the U.S. Space Force. The Company obtained this contract agreement with the U.S. Space Force upon the acquisition of BlueHalo.

4. Specifically, the Company was contracted to deliver BADGER phased array antenna systems to further the U.S. Space Force's goal of modernizing the Satellite Control Network ("SCN") through the Satellite Communication Augmentation Resource ("SCAR") program. The BADGER product would assist in advancing the aging SCN by contributing phased array antennas, which would allow the SCN to communicate with multiple satellites simultaneously.

5. During the Relevant Period, the Individual Defendants represented to investors that the SCAR program would drive the Company's revenue growth and that the contract was a "tremendous growth opportunity" for AeroVironment, despite the likelihood that the Company would face competition from other suppliers for the SCAR program work.

6. For example, on June 24, 2025, during post-market hours, the Company issued a press release titled "AeroVironment Announces Fiscal 2025 Fourth Quarter and Fiscal Year Results" (the "FY 2025 Earnings Release"). The FY 2025 Earnings Release included guidance for the Company's fiscal year ("FY") [1] 2026, stating, in relevant part:

> ***For fiscal year 2026*** inclusive of the projected results of the BlueHalo acquisition, which closed May 1, 2025, ***the Company expects revenue of between $1.9 billion and $2.0 billion***, non-GAAP adjusted EBITDA of between $300 million and $320 million, and ***non-GAAP earnings per diluted share***, which excludes amortization of intangible assets, other non-cash purchase accounting expenses and equity securities investments gains or losses, ***of between $2.80 and $3.00.***[2]

---

[1] AeroVironment's FY spans from May 1st to April 30th.
For the period of time between May 1, 2024 and April 30, 2025, "FY 2025."
For the period of time between May 1, 2025 and April 30, 2026, "FY 2026."
[2] All emphasis herein has been added unless otherwise stated.

7. Additionally, on September 30, 2025, the Company held its Investor Open House (the "Investor Open House"), where Defendant Clum touted AeroVironment's close communication with the U.S. Space Force. Specifically, Defendant Clum quoted the Director of the U.S. Space Force's Rapid Capabilities Office ("RCO") as stating "***We're going to need a bunch of SCARs, and we're going to need them fast as we can make them . . . We're ready to scale***." Further, Defendant Clum stated, in relevant part, that "***the customer is asking for more. We're ready to build more.***"

8. The truth began to emerge on January 20, 2026, when the Company filed a current report on Form 8-K with the SEC (the "January 2026 8-K"), which announced that the U.S. government issued a stop work order on AeroVironment's contract to deliver BADGER systems to the U.S. Space Force's SCAR program.

9. On this news, the price of the Company's stock fell $61.97 per share, or approximately 15.8%, from a closing price of $392.86 on January 16, 2026, to close at $330.89 per share on January 20, 2026. However, the Individual Defendants continued to conceal the full truth regarding the Company's likelihood and extent of continued revenue from the SCAR program.

10. For example, the January 2026 8-K stated that the stop work order "allows for the parties to negotiate an amended agreement for the future of the SCAR program," and that the Company "expects to continue to deliver capabilities and products for the SCAR program," thus leading investors to believe the contract with the U.S. Space Force would be reinstated.

11. The truth continued to emerge on March 10, 2026, when the Company issued a press release titled "AeroVironment Announces Fiscal 2026 Third Quarter Results" (the "3Q 2026 Earnings Release"), which reported a third-quarter operating loss of $179 million, compared to an

operating loss of $3.1 million from the same quarter of FY 2025. The 3Q 2026 Earnings Release also lowered the Company's FY 2026 guidance outlook to "between $1.85 billion and $1.95 billion."

12. Later that day, the Company hosted an earnings call to address the 3Q 2026 Earnings Release financial results (the "3Q 2026 Earnings Call"), where Defendant Nawabi announced that "***the U.S. Space Force has concluded to terminate [the Company's] existing contract.***" Additionally, on the 3Q 2026 Earnings Call, Defendant McDonnell noted that the "***well-publicized stop work order for the SCAR program did have a negative impact on the quarter,***" which was the reason the Company lowered its FY 2026 guidance in the 3Q 2026 Earnings Release.

13. On this news, the price of the Company' stock fell $13.84 per share, or approximately 6.2%, from a closing price of $221.57 on March 10, 2026, to close at $207.73 per share on March 11, 2026. However, the Individual Defendants continued to conceal the full truth regarding the Company's likelihood and extent of continued revenue from the SCAR program.

14. For example, on the 3Q 2026 Earnings Call, Defendant Nawabi revealed that the reason the U.S. Space Force had terminated the contract was because "we could not come to a mutually acceptable agreement with our customer to modify the existing contract and resume work," and that "AeroVironment "remain[s] in active discussions with the U.S. Space Force" regarding the program and that "we remain fully committed to delivering this innovative capability to the market while aligning to our customers' needs."

15. The truth fully emerged on June 22, 2026, when the Company filed with the SEC a current report on Form 8-K (the "June 2026 8-K"), which announced that AeroVironment's previous quarterly report from March 11, 2026, required restatement and "should no longer be

relied upon" because its goodwill impairment calculation was understated by $89.4 million. Notably, the error in the calculation resulted from a "newly identified material weakness in the Company's internal control over financial reporting," and thus its "disclosure controls and procedures as of January 31, 2026 were ***ineffective.***"

16. On this news, the price of the Company' stock fell $18.28 per share, or approximately 10.8%, from a closing price of $169.61 on June 18, 2026, to close at $151.33 per share on June 22, 2026.

17. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to AeroVironment, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, inter alia, that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; (2) as a result, the Company's potential business and financial prospects was overstated; (3) the Company's goodwill impairment charge to the Space reporting unit was understated; and (4) the Company's disclosure controls and procedures were materially deficient. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

18. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

19. The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

20. Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the price of the stock was artificially inflated, obtaining combined proceeds of ***approximately $6.8 million***.

21. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

22. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and its President of Space, Cyber & Directed Energy to a securities class action lawsuit pending in the United States District Court for the Eastern District of Virginia (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

23. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Nawabi, McDonnell, and Clum's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14.a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

28. Plaintiff is a current shareholder of AeroVironment. Plaintiff has continuously held AeroVironment common stock at all relevant times.

### Nominal Defendant AeroVironment

29. AeroVironment is a Delaware corporation with principal executive offices at 241 18th Street South, Suite 650, Arlington, Virginia 22202. AeroVironment's common stock trades on the Nasdaq Stock Market LLC ("Nasdaq") under the ticker symbol "AVAV."

### Defendant Nawabi

30. Defendant Nawabi has served as the Company's CEO, President, and as a Company

director since May 2016. Additionally, Defendant Nawabi serves as Chairman of the Board and as a member of the Executive Committee. Defendant Nawabi previously served as the Company's Vice President and General Manager of Efficient Energy Systems from December 2011 to April 2015, as the Company's Vice President and Chief Operating officer ("COO") from April 2015 to January 2016, and as the President and COO from January 2016 to May 2016.

31. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Nawabi made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 16, 2025 | 17,300 | $263.05 | $4,550,765 |

Thus, in total, before the fraud was exposed, Defendant Nawabi sold 17,300 shares of Company stock on inside information, for which he received approximately $4.6 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32. The Schedule 14A the Company filed with the SEC on August 13, 2025 (the "2025 Proxy Statement") stated the following about Defendant Nawabi:

> Mr. Nawabi has served as our President and Chief Executive Officer since May 2016. Previously, Mr. Nawabi served as our President and Chief Operating Officer from January 2016 to May 2016 and as Senior Vice President and Chief Operating Officer from April 2015 to January 2016. He also served as Senior Vice President and General Manager, EES from December 2011 to April 2015. Prior to joining the company, Mr. Nawabi served as Vice President, Global Sales of Altergy Systems, a designer and manufacturer of fuel cell power systems, from March 2010 through November 2011, and as Vice President, Americas, and Vice President, Global Sales for C&D Technologies, a producer and marketer of electrical power storage and conversion products, from February 2009 through March 2010. Prior to joining C&D Technologies, Mr. Nawabi worked for 16 years with American Power Conversion Corporation, a provider of power protection products and services, in a

succession of positions of increasing responsibility, most recently as Vice President, Enterprise Segment, North America and Canada. During his 16-year tenure at American Power Conversion, Mr. Nawabi was instrumental to the company's growth into global market leadership positions in power protection and data center physical infrastructure, with significant roles in starting and growing the company's data center physical infrastructure business and in developing and expanding the company's business across Europe and Asia. Mr. Nawabi currently serves as the Chairman of the Board of LiquidStack, Inc., a provider of next-generation cooling solutions to many of the world's largest cloud services, semiconductor, manufacturing and IT hardware providers. Mr. Nawabi has a B.S. in electrical engineering from the University of Maryland, College Park.

**Defendant McDonnell**

33. Defendant McDonnell served as the Company's Executive Vice President and CFO from May 1, 2025 to April 30, 2026. Defendant McDonnell currently serves in an advisory role, which began on May 1, 2026, until July 31, 2026. Defendant McDonnell also previously served as the Company's Senior Vice President and CFO from February 2020 to May 2025.

34. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant McDonnell made the following sales[3] of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| October 10, 2025 | 998 | $399.74 | $398,941 |
| November 10, 2025 | 513 | $331.46 | $170,039 |
| December 10, 2025 | 511 | $249.37 | $127,428 |
| January 12, 2026 | 999 | $367.60 | $367,232 |
| February 10, 2026 | 879 | $267.60 | $235,220 |
| March 10, 2026 | 396 | $224.55 | $88,922 |

Thus, in total, before the fraud was exposed, Defendant McDonnell sold 4,296 shares of Company stock on inside information, for which he received approximately $1.4 million in proceeds. His

[3] Sales were made by the McDonnell Moore Living Trust, of which Defendant McDonnell is one of the trustees.

insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35. The 2025 Proxy Statement stated the following about Defendant McDonnell:

> Kevin McDonnell has served as our Executive Vice President and Chief Financial Officer since May 1, 2025. Prior to that, he served as our Senior Vice President and Chief Financial Officer since February 10, 2020. Before joining the company, Mr. McDonnell served as Senior Vice President, Chief Financial Officer of JAMS, Inc., which provides alternative dispute resolution services, from September 2014 to February 2020. Prior to joining JAMS, Inc., Mr. McDonnell served in a variety of management and finance roles including as the co-founder of DoubleBeam, Inc., a provider of mobile retail solutions, from 2011 to 2014, the Chief Financial and Administrative Officer of Orange County Container Group LLC, a manufacturer of paperboard and paper-based packaging, from 2008 to 2011, the Executive Vice President, Finance and Administration, and Chief Financial Officer for Leiner Health Products from 2006 to 2008 and the Senior Vice President, Finance and Administration, and Chief Financial Officer for Memorex Corporation from 2004 to 2006. Mr. McDonnell previously held financial leadership positions with Digital Insight, Printrak, Teradata and Mattel. Mr. McDonnell also serves as a director for our direct and indirect wholly-owned U.S. subsidiaries. Mr. McDonnell holds a B.A. in Business Administration from Loyola Marymount University and a J.D. from Loyola Law School.

**Defendant Clum**

36. Defendant Clum has served as the Company's President of Space, Cyber & Directed Energy since October 2025.

37. The Company's website,[4] under the "Leadership" tab, states the following about Defendant Clum:

> Mary Clum has served as President of our Space, Cyber & Directed Energy since October 2025.
>
> Prior to joining AV, Mary was the President of the Product & Space Systems portfolio, overseeing BlueHalo's operations focused on Product Innovation & Manufacturing. As a key member of the Executive Leadership Team, Mary ensured the BlueHalo Labs sector operated in alignment with the company's strategic

[4] https://www.avinc.com/team/mary-clum/

> roadmap.
>
> Mary has more than 25 years of operational experience within small businesses, private equity-backed middle market businesses, and large publicly traded companies. Throughout her career, Mary has served in multiple roles–including program management, site leadership, systems analysis, operations, and business development–for customers in the Department of Energy, Department of Defense, and other government agencies and commercial organizations. She is an experienced leader of programs and functions, recognized for her ability to develop and deliver highly technical products.
>
> Prior to joining BlueHalo (previously ATA) in 2018, Mary served as the Senior Manager for the Directed Energy and Mobile Range product areas at Raytheon Company. Mary earned a Bachelor of Arts degree in Political Science from the University of New Mexico and a Master of Science degree in Project Management from the University of Southern California.

**Defendant Albers**

38. Defendant Albers served as a Company director from May 1, 2025 until he resigned, effective June 17, 2026.

39. The 2025 Proxy Statement stated the following about Defendant Albers:

> Mr. Albers joined Arlington Capital Partners in 2018 where he currently serves as a Principal on the investment team. Prior to joining Arlington, Mr. Albers was an Associate at The Carlyle Group where he focused on buyout and strategic minority investments in the aerospace, defense, and government services sectors. Prior to The Carlyle Group, Mr. Albers was an Analyst at Morgan Stanley in its industrials investment banking group where he advised clients on a variety of mergers and acquisitions and capital markets transactions. Mr. Albers currently serves on the board of directors of several private Arlington portfolio companies, including Afton Scientific, BlueHalo, Forged Solutions Group, Grand River Aseptic Manufacturing, and Qarbon Aerospace, and previously served on the board of directors of Eqlipse Technologies. Mr. Albers holds an M.B.A. from Harvard Business School and a B.B.A. in Finance, summa cum laude, from The College of William & Mary.

**Defendant Burbage**

40. Defendant Burbage has served as a Company director since 2013. Defendant Burbage also serves as Chairperson of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee and the Executive Committee.

41. The 2025 Proxy Statement stated the following about Defendant Burbage:

> Mr. Burbage has served as a member of our board of directors since 2013. Mr. Burbage retired from Lockheed Martin Aeronautics Company in April 2013, after a 33-year career during which he served most recently as Executive Vice President and General Manager, Joint Strike Fighter Program from 2000 to 2013. Mr. Burbage also served on active duty in the U.S. Navy as a Naval aviator and recorded more than 3,000 flight hours in 38 types of military aircraft before retiring as a Captain in the U.S. Naval Reserve in 1994. Mr. Burbage currently serves as a director of GKN Aerospace North America, Inc., a global tier one supplier of airframe and engine structures, landing gear, electrical interconnection systems, transparencies, and aftermarket services and Strike Defense Systems, LLC, a provider of signal processing and sensor solutions. Mr. Burbage received a B.S. in aerospace engineering from the U.S. Naval Academy and holds an M.S. in aeronautical systems from the University of West Florida and an M.B.A. from the University of California, Los Angeles.

**<u>Defendant Davidson</u>**

42. Defendant Davidson has served as a Company director since June 2023. Defendant Davidson also serves as a member of the Audit Committee and the Cybersecurity Committee.

43. The 2025 Proxy Statement stated the following about Defendant Davidson:

> Admiral Davidson has served as a member of our board of directors since June 2023. Mr. Davidson retired from the U.S. Navy in May 2021, following a highly distinguished military career which spanned nearly 39 years of service and culminated in his appointment as a four-star Admiral and in service as Commander of United States Indo-Pacific Command (INDOPACOM) from 2018 to 2021. He previously served as the commander of U.S. Fleet Forces Command/Naval Forces U.S. Northern Command and as the commander, U.S. 6th Fleet, and the commander, Naval Striking and Support Forces NATO, while simultaneously serving as the deputy commander, U.S. Naval Forces Europe and U.S. Naval Forces Africa. Mr. Davidson founded and now runs Davidson Strategies LLC, a management, technical and strategic advisory firm.
>
> Mr. Davidson is currently on the board of directors of Par Pacific Holdings, Inc. (NYSE: PARR), an oil and gas exploration and production company, and Norfolk Southern Corporation (NYSE: NSC), a freight transportation network operator. He is also a Board Member at the Center for Strategic and Budgetary Assessments, an independent, non-partisan policy research institute, and serves on military advisory groups to the Sasakawa Peace Foundation USA, as well as the United States Institute of Peace.

> He received a Bachelor of Science degree in Physics from the U.S. Naval Academy in 1982 and a Master of Arts in National Security and Strategic Studies from the U.S. Naval War College in 1992.

**Defendant Lewis**

44. Defendant Lewis has served as a Company director since 2021. Defendant Lewis also serves as the Chairperson of the Cybersecurity Committee and as a member of the Audit Committee.

45. The 2025 Proxy Statement stated the following about Defendant Lewis:

> From July 1998 to June 2023, Ms. Lewis served as the President and Chief Executive Officer of AirBorn Consolidated Holdings, Inc., a middle-market, employee-owned company specializing in high reliability electronics manufacturing. She served as Chairperson of AirBorn from November 2013 to June 2024. Ms. Lewis has served in the manufacturing industry for over 40 years, with experience in accounting and finance, supply chain and manufacturing, information technology, business development, distribution and general management. From approximately 2006 through 2019, Ms. Lewis served in various board and officer roles for the National and Southwest Chapter of the ESOP Association, which promotes employee ownership awareness, best practices and provides strong lobbying efforts in Congress. Ms. Lewis currently serves on the Georgetown, Texas Chamber of Commerce Board of Directors. Ms. Lewis earned her Bachelor's Degree in Accounting from The University of Texas at Arlington — College of Business and completed an Executive Development Program at The Wharton School, University of Pennsylvania.

**Defendant Long**

46. Defendant Long has served as a Company director since August 2023. Defendant Long also serves as a member of the Nominating and Corporate Governance Committee and the Cybersecurity Committee.

47. The 2025 Proxy Statement stated the following about Defendant Long:

> The Honorable Mary Beth Long has served as a member of our board of directors since August 2023. Ms. Long is an American foreign policy expert, entrepreneur, and former U.S. Government official. From 2007-2009, Ms. Long served as the Assistant Secretary of Defense under Secretary of Defense Robert E. Gates, where she was the first woman confirmed to a four-star military equivalent position by the U.S. Senate. This role was the culmination of 17 years of intelligence and defense related government service where she held multiple leadership roles including

> Chair of NATO's nuclear and missile defense High Level Group (HLG), Principal Deputy Secretary of Defense for Asia and Southeast Asia, and Deputy Secretary of Defense for Counter Narco-terrorism.
>
> Ms. Long is currently the Principle at MB Long and Associates, PLLC, a law firm specializing in defense sales, contracting and compliance, and until 2022 was a principle with Askari Defense & Intelligence, LLC, a firm focused on international consultancy, since founding each firm in 2010. Ms. Long is also a member of the strategic advisory board for Liberty Defense Holdings, Ltd. Ms. Long was also a director for Red Cat Holdings, Inc. (NASDAQ: RCAT), a drone company, from November 2022 through July 2023. Ms. Long additionally acted as a consultant for Global Alliance Advisors, Inc., an international advisory firm, from 2017 to November 2021. In addition, Ms. Long also founded and led a highly successful government contracting firm, Metis Solutions, LLC, which she sold in 2016 to a private equity group.
>
> Ms. Long is an Honors Graduate, magna cum laude, and Phi Beta Kappa from Penn State University, where she studied the Chinese language abroad in Taiwan. She currently serves on the university's Provost's Global Advisory Council. She also received her law degree, with honors, from Washington and Lee School of Law. Ms. Long is a member of the Board of Directors of the International Spy Museum and the Defense Intelligence Memorial Fund.

**<u>Defendant Muller</u>**

48. Defendant Muller has served as a Company director since 2013. Defendant Muller also serves as the Chairperson of the Audit Committee and as a member of the Compensation Committee and the Executive Committee.

49. The 2025 Proxy Statement stated the following about Defendant Muller:

> Mr. Muller has served as a member of our board of directors since 2013. Mr. Muller served as Vice Chairman of NRG Energy, Inc. (NYSE: NRG), a U.S.-based producer and retail supplier of electricity, from December 2012 to February 2017. Prior to the merger in 2012 of NRG and GenOn Energy Inc., Mr. Muller served as the Chairman and Chief Executive of GenOn, which also produced and sold electricity in the United States, a position he held beginning in 2010. From 2005 to 2010, Mr. Muller was Chairman and Chief Executive of Mirant Corporation, which produced and sold electricity in the United States and internationally. Previously, Mr. Muller served as President and Chief Executive Officer of Edison Mission Energy until 2000, which produced electricity in the United States and internationally. Mr. Muller previously served as Vice President, Chief Financial Officer, General Counsel and Secretary of Whittaker Corporation, a conglomerate with activities in aerospace, chemicals, healthcare and metals.

From 2007 to 2024, Mr. Muller served as a director of Transocean Ltd. (NYSE: RIG), an offshore oil and gas driller. Mr. Muller currently serves as the Chairman of the Advisory Board of the UCLA Institute for Carbon Management and of CarbonBuilt, Inc., a provider of low carbon concrete technology, Concrete, AI, Inc., a provider of AI-assisted concrete production and carbon reductions, Equatic, Inc., a carbon-capture technology company, Nextli Technologies, Inc., a cement decarbonization company, and, Specifx, Inc., developer of lithium extraction technologies. He previously served as a director of Contact Energy, Ltd., Edison Mission Energy, Interval, Inc., Oasis Residential, Inc., Ormat Technologies, Inc., RealEnergy, Inc., RigNet Inc., Strategic DataCorp., The Keith Companies, Inc., and Whittaker Corporation. Mr. Muller is a member of the Council on Foreign Relations and the Pacific Council on International Policy, and previously was Chairman of the U.S. — Philippines Business Committee, Co-Chairman of the International Energy Development Council and a member of the Board of Trustees of the Riverview School. Mr. Muller received his undergraduate degree from Dartmouth College and a J.D. from Yale Law School.

**Defendant Page**

50. Defendant Page has served as a Company director since 2013. He also serves as the Chairperson of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

51. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Page made the following sales[5] of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| January 15, 2026 | 1,000 | $377.62 | $377,620 |
| February 17, 2026 | 500 | $254.95 | $127,475 |
| February 19, 2026 | 250 | $275 | $68,750 |
| March 2, 2026 | 250 | $300 | $75,000 |
| March 16, 2026 | 250 | $212.52 | $53,130 |
| April 15, 2026 | 250 | $197.29 | $49,322 |

[5] Sales were made by the Stephen F. Page Living Trust, of which Defendant Page is the trustee.

| | | | |
|---|---|---|---|
| May 15, 2026 | 250 | $162.31 | $40,577 |
| June 15, 2026 | 250 | $174.41 | $43,602 |

Thus, in total, before the fraud was exposed, Defendant Page sold 3,000 shares of Company stock on inside information, for which he received approximately $835,477 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

52. The 2025 Proxy Statement stated the following about Defendant Page:

> Mr. Page has served as a member of our board of directors since 2013. Mr. Page served on the board of directors and audit committees of Lowe's Companies, Inc. (NYSE: LOW), a home-improvement retailer, from 2003 to 2012; PACCAR, Inc. (NASDAQ: PCAR), one of the largest manufacturers of medium and heavy-duty trucks in the world, from 2004 to 2012; and Liberty Mutual Holding Company Inc., one of the largest property and casualty insurance companies in the U.S., where he was lead director. Before retiring in 2004, Mr. Page served in many leadership roles at United Technologies Corporation, a provider of high-technology products and services to the global aerospace and building systems industries that merged with Raytheon Corporation in April 2020 to form RTX Corporation (formerly Raytheon Technologies Corporation), including director, Vice Chairman and Chief Financial Officer, and President and Chief Executive Officer of Otis Elevator, formerly a division of United Technologies. Mr. Page holds a B.S. in business administration from Loyola Marymount University and J.D. from Loyola Law School.

**Defendant Votel**

53. Defendant Votel has served as a Company director since November 2023 and also serves as a member of the Compensation Committee and the Cybersecurity Committee.

54. The 2025 Proxy Statement stated the following about Defendant Votel:

> General Joseph L. Votel has served as a member of our board of directors since November 2023. Mr. Votel is a retired four-star general with 39 years of military experience. He most recently served as the Commanding General of the United States Central Command and before that was the Commander of the United States Special Operations Command. He served in the Pentagon, Operation ENDURING FREEDOM, and Operation IRAQI FREEDOM, among others.
>
> Following his retirement from military service, General Votel served as President & CEO of Business Executives for National Security (BENS) from 2020 to 2023.

He is a member of the Board of Trustees of Noblis Corporation, and a Strategic Advisor for Sierra Nevada Corporation, both of which are positions he has held since 2019. Mr. Votel is a Board Director with Minnesota Wire & Cable Company, a custom design, development and manufacturing company for wire, cable and interconnect assemblies DC Capital Partners, LLC, a private equity investment firm, and Helix Decision Science, LLC, a technology company focused on the interaction of AI systems, supporting technologies and data across businesses, a member of the Government Advisory Board for Insight Partners and a member of the Draper Corporation. He is also a member of the Board of Governors at the Middle East Institute and the Distinguished Chair of the Combating Terrorism Center at West Point. Mr. Votel also serves as an advisor to Ansys Government Initiative, Orbis Operations, LLC and NtelSec, Inc.

Mr. Votel is a member of the Executive Boards at Freedom House and the UPenn Center for Ethics and the Rule of Law (CERL). He is a current member of the Defense Business Board and the Council on Foreign Relations.

Mr. Votel graduated from the United States Military Academy in 1980 and earned a master's degree from the U.S. Army Command and Staff College in 1991 and from the Army War College in 2001.

**Defendant Wodlinger**

55. Defendant Wodlinger served as a Company director from May 1, 2025 until he resigned, effective June 17, 2026.

56. The 2025 Proxy Statement stated the following about Defendant Wodlinger:

Mr. Wodlinger joined Arlington Capital Partners in 2006 where he currently serves as a Managing Partner. As a Managing Partner of Arlington, Mr. Wodlinger shares overall responsibilities for all management and investment activities of the firm and leads Arlington's investments in the National Security sector. Mr. Wodlinger has over 20 years of private equity and merger and acquisition transactional experience and has completed more than 65transactions over the course of his career at Arlington. Prior to joining Arlington, Mr. Wodlinger worked in Deutsche Bank's Financial Sponsors Group in New York. While at Deutsche Bank, Mr. Wodlinger worked on the origination, diligence, structuring, and financing of leveraged buyouts. Prior to Deutsche Bank, Mr. Wodlinger worked as a management consultant focused on the U.S. Intelligence Community. Mr. Wodlinger currently serves as the Chairman of the board of directors of several private Arlington portfolio companies, including BlueHalo and Systems Planning and Analysis. Mr. Wodlinger previously served as the Chairman of the board of directors of Eqlipse Technologies, and Centauri, and as a member of the board of directors of Cambridge MajorLabs, Micron Technologies, Novetta Solutions, Polaris Alpha, and Quantum Spatial. Mr. Wodlinger graduated cum laude, with an A.B. in Economics from Georgetown University.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

57. By reason of their positions as officers, directors, and/or fiduciaries of AeroVironment and because of their ability to control the business and corporate affairs of AeroVironment, the Individual Defendants owed AeroVironment and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage AeroVironment in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of AeroVironment and its shareholders so as to benefit all shareholders equally.

58. Each director and officer of the Company owes to AeroVironment and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

59. The Individual Defendants, because of their positions of control and authority as directors and/or officers of AeroVironment, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

60. To discharge their duties, the officers and directors of AeroVironment were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

61. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of AeroVironment, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of AeroVironment's Board at all relevant times.

62. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

63. To discharge their duties, the officers and directors of AeroVironment were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of AeroVironment were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States,

and pursuant to AeroVironment's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how AeroVironment conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of AeroVironment and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that AeroVironment's operations would comply with all applicable laws and AeroVironment's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial

information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

64. Each of the Individual Defendants further owed to AeroVironment and the shareholders the duty of loyalty requiring that each favor AeroVironment's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

65. At all times relevant hereto, the Individual Defendants were the agents of each other and of AeroVironment and were at all times acting within the course and scope of such agency.

66. Because of their advisory, executive, managerial, directorial, and controlling positions with AeroVironment, each of the Individual Defendants had access to adverse, non-public information about the Company.

67. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by AeroVironment.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

68. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

69. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal

adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

70. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of AeroVironment was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

71. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

72. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of AeroVironment and was at all times acting within the course and scope of such agency.

## AEROVIRONMENT'S CODE OF ETHICS

73. AeroVironment's Code of Ethics states that it "applies to all officers, employees, and members of the boards of directors" of the Company and its subsidiaries. The Company's Code of Ethics also notes that it provides "guidelines for conducting the business of the Company

consistent with the highest standards of business ethics."

74. In a section titled "Reporting Violations of the Code," the Code of Ethics states the following:

> All employees have a duty to report any known or suspected violation of this Code, including any violation of laws, rules, regulations or policies that apply to the Company. Reporting a known or suspected violation of this Code by others should not be considered an act of disloyalty, but rather safeguarding the reputation and integrity of the Company and its employees.
>
> Your conduct can reinforce an ethical atmosphere and positively influence the conduct of your fellow employees. If you are unable to stop suspected misconduct or discover it after it has occurred, you must report it to the Company's Ethics Officer. Misconduct cannot be excused because it was directed or requested by another employee. In this regard, you are expected to alert management, the Company Ethics Officer or any other attorney member of the Company's Legal & Compliance Department (the "***Legal Department***") whenever you discover or suspect an illegal, dishonest or unethical act or you become aware of a potential conflict of interest or believe that the Code has been violated by an employee or anyone the Company engages to do business on our behalf. Similarly, if you are aware of a questionable accounting, internal accounting controls or auditing matter, you must promptly report it. The Audit Committee of AeroVironment, Inc.'s Board of Directors (the "***Board***") has established procedures for receiving and treating such complaints using the AV Hotline, ethics and compliance reporting resource. Supervisors, managers, and officers who receive reports of misconduct must immediately contact the Ethics Officer.
>
> When reporting a violation, you may choose to remain anonymous, although this may render the Company unable to act upon the violation, because it cannot receive additional information from you. However, if you do choose to make an anonymous report, you should create and preserve your own record of the report in order to be able to demonstrate your compliance with the requirement of reporting violations. Generally speaking, every effort will be made to maintain the confidentiality of reports of potential violations. However, the identity of the reporting employee may become known or may have to be revealed in the course of the investigation or to take corrective action to the extent permitted by applicable law.
>
> It is the Company's policy that anyone who violates this Code will be subject to appropriate discipline, which may include termination of employment or engagement or removal from Board or the board of directors of any subsidiary, as appropriate, based upon the facts and circumstances of each particular situation. An employee accused of violating this Code will generally be given an opportunity to present his or her version of the events at issue prior to any determination of appropriate discipline; this shall not limit the Company's rights to take immediate

> action where deemed necessary and permissible under applicable law. Any employee who fails to report a known or suspected violation by another employee may also be subject to appropriate discipline. Furthermore, employees who violate the law or this Code may expose themselves to substantial civil damages, criminal fines and prison terms. The Company may also face substantial fines and penalties in such situations, as well as damage to the Company's reputation and standing in the community. In short, if a Company employee's conduct does not comply with the law or with this Code, serious consequences may result for both the employee and the Company.

(emphasis in original).

75. In the same section, under a subheading titled "Waivers of the Code," the Code of Ethics states the following:

> Only the Board can waive any part of this Code for our directors or executive officers; any such waiver will be disclosed to the public as required by law or the rules of the Nasdaq Global Market. Waivers of this Code for other employees may be made only by our Ethics Officer in consultation with AeroVironment's Chief Executive Officer or Chief Financial Officer and must be reported to the Board's Audit Committee.

76. In a section titled "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> A conflict of interest can occur when an employee's private interest interferes, or appears to interfere, in any way with the interests of the Company as a whole. An employee should actively avoid engaging in any private interest that may influence the employee's ability to act in the interests of the Company or that makes it difficult to perform your work objectively and effectively. It is difficult to list all the ways in which a conflict of interest may arise. However, the following situations are cases of conflict of interest unless the Ethics Officer has provided prior consent:
>
> * * *
>
> - <u>Service on Boards and Committees</u>: No employee should serve on a board of directors or trustees or on a committee of any entity (whether profit or not-for- profit) whose interests reasonably could be expected to conflict with those of the Company. Employees must obtain prior approval from the Ethics Officer before accepting any such board or committee position. The Company may revisit its approval of any such position at any time to determine whether service in such position is still appropriate.
>
> Conflict of interest issues concerning members of the Board will be addressed by the Board's Nominating and Corporate Governance Committee.

(emphasis in original).

77. In a section titled "Corporate Opportunities," the Code of Ethics states the following:

> As a Company employee, you must put the interests of the Company ahead of your personal financial interests. Specifically, you should seek to advance the Company's interests when the opportunity to do so arises, e.g. if you discover a business opportunity that is in the Company's line of business, you must first present the business opportunity to the Company before pursuing the opportunity in your individual capacity. No employee may use corporate property, information or their position for personal gain, and no employee may compete with the Company either directly or indirectly.
>
> Company employees must fully disclose to the Ethics Officer the terms and conditions of each business opportunity covered by this Code that the employee wishes to pursue. The Ethics Officer will work with management to determine whether the Company wishes to pursue the business opportunity. If the Company waives its right to pursue the business opportunity, which must be authorized in writing by AeroVironment's Chief Executive Officer with the Ethics Officer's concurrence, the employee may pursue the business opportunity on the same terms and conditions offered to the Company and consistent with the other ethical guidelines set forth in this Code. Business opportunities available to directors or executive officers may only be waived as described in "Waivers of the Code" above.

78. In a section titled "Competition and Fair Dealing," the Code of Ethics states the following, in relevant part:

> The Company competes vigorously, but fairly. All employees are obligated to deal fairly with the Company's customers, suppliers and competitors. Employees will not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation or any other unfair dealing practice.

79. In the same section, under a subheading titled "Securities Trading," the Code of Ethics states the following:

> The United States securities laws contain very strict prohibitions against trading in securities of publicly-held companies on the basis of material nonpublic information or while securities offerings are in process. These laws place the responsibility on the Company's officers, directors and employees to ensure that nonpublic information about the Company is not used unlawfully in the purchase and sale of securities. Consistent with the Company's Insider Trading Policy, which

is available to all employees and directors, the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material, nonpublic information about the Company. Therefore, if you have material, nonpublic information regarding the Company, neither you nor any member of your immediate family or a person living in your household may buy or sell securities of the Company or engage in any other action to take advantage of, or pass on to others, that information. This policy also applies to trading in securities of any other company, including suppliers and competitors, about which you have material, nonpublic information which is obtained in the course of your employment with the Company. If you are uncertain about any securities transaction, the Legal Department can assist you.

80. In a section titled "Company Records," the Code of Ethics states the following:

Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports and other disclosures to the public. In addition, our records are the source of essential data that guides business decision-making and strategic planning. Company records include, but are not limited to, booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, product development, electronic data files and all other records maintained in the ordinary course of our business.

All Company records must be complete, accurate and reliable in all material respects. There is never a reason to make false or misleading entries. In addition, undisclosed or unrecorded funds, payments or receipts are strictly prohibited.

The Company's business records must be maintained for periods as specified by department requirements and the Company's records retention policy. Records may be destroyed only at the expiration of the pertinent period. In no case should you discard or destroy, or direct anyone else to discard or destroy, any documents involved in a pending or threatened litigation, government inquiry or any other official proceeding under subpoena or other information request, regardless of the periods specified in the record retention policy.

You are responsible for understanding and complying with the Company's record keeping policy. Ask the Ethics Officer if you have any questions.

81. In a section titled "Accuracy of Financial Reports," the Code of Ethics states the following:

The Company is committed to full and accurate financial disclosure and to maintaining its books and records in compliance with all applicable laws, rules and regulations. The Company encourages all employees to make us aware of any practices, procedures or circumstances that raise concerns about the integrity of our financial disclosures, books and records.

> Employees should be on guard for, and promptly report, evidence of improper financial reporting. Examples of suspicious activities that should be reported include:
>
> - Financial results that seem inconsistent with the performance of underlying business transactions;
> - Inaccurate Company records, such as overstated expense reports, or erroneous time sheets or invoices;
> - Transactions that do not seem to have a good business purpose; and
> - Requests to circumvent ordinary review and approval procedures.
>
> The Company's senior financial officers and other employees working in the Company's accounting function have a special responsibility to ensure that all our financial disclosures are full, fair, accurate, timely and understandable. Such employees must understand and strictly comply with the Company's Policy Concerning Disclosure Controls and Procedures, as well as generally accepted accounting principles as adopted by the Company and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

82. In a section titled "Compliance with Laws and Regulations," the Code of Ethics states the following:

> Each employee must comply with the laws of the cities, states and countries in which the Company operates. We will not tolerate any activity that violates any laws, rules or regulations applicable to the Company. This includes, without limitation, laws covering commercial bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, unauthorized public communications concerning the Company, illegal political contributions, antitrust prohibitions, export control and sanctions, human rights (including modern slavery), foreign corrupt practices, offering or receiving gratuities, environmental laws, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful or otherwise appropriate, you should seek advice immediately from the Ethics Officer or other attorney member of the Legal Department.

83. In a section titled "Employment Practices," under a subheading titled "Disciplinary Action," the Code of Ethics states the following:

Employees who fail to comply with policies, standards and guidelines outlined in this Code, or with the laws and regulations applicable to the Company's businesses, are subject to disciplinary action, including possible termination of employment. For example, disciplinary action may be taken against any of the following persons:

- Any employee, director or officer who violates this Code or applicable laws and regulations, or who directs others to do so;
- Any employee, director or officer who deliberately withholds relevant information, or knowingly provides false information, concerning a violation of this Code or applicable laws and regulations;
- The violator's supervisor or manager to the extent that the circumstances of a violation reflects the manager's disregard for this Code or applicable laws or regulations;
- Any employee, director or officer who retaliates, directly or indirectly, against another employee for reporting a suspected violation of this Code or applicable laws and regulations, or assisting an investigation of a suspected violation.

The Company has implemented the following disciplinary policies to ensure that prompt and consistent actions are taken in response to Code violations:

1. Range of Penalties: All violations of this Code will be treated seriously and will result in the prompt imposition of penalties which may include (a) an oral or written warning, (b) a reprimand, (c) suspension, (d) termination and/or restitution. As appropriate, violations may also be reported to the appropriate regulatory agencies or other authorities.
2. Disciplinary Process: The penalty for a particular violation will be decided on a case-by-case basis and will depend on the nature and severity of the violation as well as the employee's history of non-compliance and cooperation in the disciplinary process. Significant penalties will be imposed for violations resulting from intentional or reckless behavior. Penalties may also be imposed when an employee fails to report a violation due to the employee's indifference, deliberate ignorance or reckless conduct. Where there is credible evidence of a violation, the Ethics Officer will determine the appropriate sanction with the assistance of the Board when necessary.
3. Consistent Enforcement: All employees, directors and officers will be treated equally with respect to the imposition of disciplinary measures. Pursuant to this policy, all levels of employees will be subject to the same disciplinary action for the commission of a similar offense.

84. In violation of the Code of Ethics, the Individual Defendants (as key officers and

members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

**AEROVIRONMENT'S AUDIT COMMITTEE CHARTER**

85. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company on behalf of the Board and to report the results of its activities to the Board." Further, in a section titled "Purpose," the Audit Committee Charter states, in relevant part:

> Notwithstanding the foregoing, the Committee's responsibilities are limited to oversight. Management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements as well as the Company's financial reporting process, accounting policies, internal audit function, internal accounting controls and disclosure controls and procedures. The independent auditor is responsible for performing an audit of the Company's annual financial statements and its internal control over financial reporting, expressing an opinion as to the conformity of such annual financial statements with generally accepted accounting principles and the effectiveness of the Company's internal control over financial reporting and reviewing the Company's quarterly financial statements (when requested to do so by the management of the Company). It is not the responsibility of the Committee to plan or conduct audits or to determine that the Company's financial statements and disclosure are complete and accurate or prepared in accordance with generally accepted accounting principles and applicable laws, rules and regulations or to determine the effectiveness of the Company's internal control over financial reporting. Each member of the Committee shall be entitled to rely on the integrity of those persons within the Company and of the professionals and experts (including the Company's internal auditor, if any (or others responsible for the internal audit function, including

> contracted non-employee or audit or accounting firms engaged to provide internal audit services) (the "internal auditor") and the Company's independent auditor) from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

86. In a section titled "Committee Powers and Responsibilities," under a subheading titled "Annual Financial Statements and Annual Audit," the Audit Committee Charter states, in relevant part:

> 1. *Meetings with Management, the Independent Auditor and the Internal Auditor.*
>
> a. The Committee shall meet with management, the independent auditor and the internal auditor, if any, in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.
>
> b. The Committee shall review and discuss with management and the independent auditor: (i) accounting principles and financial statement presentations, including any changes in the Company's selection or application of accounting principles, significant estimates and accruals, the reasonableness of significant judgments, and issues as to the adequacy and effectiveness of the Company's internal controls and any special remedial actions adopted in light of significant deficiencies or material control deficiencies (including a discussion of management's process for assessing the effectiveness of internal controls under Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act")); (ii) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative methods under generally accepted accounting principles in the United States ("GAAP") on the Company's financial statements; and (iii) the effect of regulatory and accounting initiatives on the Company's financial statements.
>
> c. The Committee shall review and discuss with management and the independent auditor any material off-balance sheet transactions, arrangements, obligations (including contingent obligations) and other relationships of the Company with unconsolidated entities of which the Committee is made aware that do not appear on the financial statements of the Company and that may have a material current or future effect on the Company's financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenues and expenses.

> d. The Committee shall review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall also discuss the results of the annual audit and any matters required to be communicated to the Committee by the independent auditor under the standards of the PCAOB.
>
> * * *
>
> 3. *Recommendation to Include Financial Statements in Annual Report.* If applicable, the Committee shall, based on the review and discussions in paragraphs 1(d) and 2 above, and based on the disclosures received from the independent auditor regarding its independence and discussions with the auditor regarding such independence pursuant to subparagraph 3(b) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

(emphasis in original).

87. In the same section, under a subheading titled "Quarterly Financial Statements," the Audit Committee Charter states the following:

> 1. *Meetings with Management, the Independent Auditor and the Internal Auditor.* The Committee shall review and discuss the quarterly financial statements with management, the independent auditor and the internal auditor, if any, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall also discuss the results of the quarterly review and any matters required to be communicated to the Committee by the independent auditor under the standards of the PCAOB.

(emphasis in original).

88. In the same section, under a subheading titled "Internal Control Over Financial Reporting," the Audit Committee Charter states the following:

> 1. The Committee shall discuss with management its process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act, including any material weaknesses or significant deficiencies identified. The Committee shall review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditor's report on the effectiveness of internal control over financial reporting. The Committee shall discuss with the independent auditor the characterization of deficiencies in internal control over financial reporting. The Committee shall also discuss with management its remediation plan

> to address internal control deficiencies. The Committee shall determine that the disclosures describing any identified material weaknesses and management's remediation plans are clear and complete. The Committee shall discuss with management its process for performing its required quarterly certifications under Section 302 of the Sarbanes-Oxley Act, including the evaluation of the effectiveness of disclosure controls by the Chief Executive Officer and Chief Financial Officer. The Committee shall discuss with management and the independent auditor any (a) changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed and (b) any other changes in internal control over financial reporting that were considered for disclosure in the Company's periodic filings with the SEC.

89. In the same section, under the subheading titled "Other Powers and Responsibilities," the Audit Committee Charter states the following:

> The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the following:
>
> 1. The Committee shall discuss with management and the independent auditor the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" non-GAAP financial information), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.
>
> 2. The Committee shall review all related party transactions on an ongoing basis and all such transactions must be approved by the Committee.
>
> 3. The Committee shall discuss with management and the independent auditor any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function.
>
> 4. The Committee shall discuss with the Company's General Counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.
>
> 5. The Committee shall request assurances from management, the independent auditor and the Company's internal auditor, if any, that the Company's foreign subsidiaries and foreign affiliated entities, if any, are in conformity

with applicable legal requirements, including disclosure of affiliated-party transactions.

6. The Committee shall discuss with management the Company's policies with respect to risk assessment and risk management. The Committee shall discuss with management the Company's significant risk exposures and the actions management has taken to limit, monitor or control such exposures.

7. The Committee shall set clear hiring policies for employees or former employees of the Company's independent auditor that meet applicable SEC regulations and Nasdaq standards.

8. The Committee shall provide the Company with the report of the Committee with respect to the audited financial statements required by Item 407 of Reg. S-K for inclusion in each of the Company's annual proxy statements or Annual Report on Form 10-K.

9. The Committee shall prepare minutes of its meetings and provide such minutes to the Board. In addition, the Committee, through its Chair, shall report periodically to, and review with, the Board any issues that the Committee determines are necessary or advisable to report to the Board, such as any issues with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor and the performance of the Company's internal audit function. Such reports shall include any recommendations the Committee deems appropriate and any other matters that are relevant to the fulfillment of the Committee's responsibilities.

10. The Committee shall at least annually perform an evaluation of the performance of the Committee and its members, including a review of the Committee's compliance with this Charter. The Committee shall also discuss with the independent auditor its observations related to the effectiveness of the Committee.

11. As it deems necessary, the Committee shall review the results of an annual independent audit of the Company's employee benefit plans, which may be, but need not be, conducted by the Company's independent auditor. As it deems necessary, the Committee shall review with management and the Company's tax advisors the status of tax returns, including open years and potential disputes, and it shall review with the independent auditors the adequacy of tax reserves included in the Company's consolidated financial statements.

12. The Committee shall review and investigate any matters pertaining to the integrity of management or adherence to standards of business conduct as required in the Company's Code of Business Conduct and Ethics.

> 13. On a periodic basis, the Committee shall review the Company's compliance programs implemented by management to address key compliance risks, including export, anti-corruption and securities law compliance.
>
> 14. The Committee shall at least annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

90. In the same section, under the subheading "Complaints and Accounting Matters," the Audit Committee Charter states the following:

> The Committee shall establish procedures for the following: (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing and (b) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters. Among other things, the Committee will cause the Company to implement, maintain and monitor an ethics helpline that is designed to receive anonymous reports of any known or suspected violations of the Company's Code of Business Conduct and Ethics or any applicable laws and regulations. The Committee will investigate any reports received through the ethics helpline and report to the Board periodically with respect to the information received through the ethics helpline and any related investigations.

91. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background*

92. Headquartered in Virginia, AeroVironment is a defense technology provider that

develops and deploys autonomous systems, precision strike systems, directed energy systems, space-based platforms, and cyber and electronic warfare capabilities. The Company operates its business in two reportable segments: (1) Autonomous Systems and (2) Space, Cyber and Directed Energy.

93. On May 1, 2025, AeroVironment acquired BlueHalo, which was a defense technology firm that specialized in advanced engineering products and had various registered trademarks for major products, including the BADGER system. Further, AeroVironment acquired BlueHalo's $1.4 billion contract, which was later increased to $1.7 billion, with the U.S. Space Force to deliver BADGER phased array antenna systems to support the SCAR program.

94. The SCAR program is a U.S. Space Force initiative to improve the aging SCN, which tracks satellites, transmits signals, and accesses data from satellites to determine their health and status. The SCAR program aims to modernize the SCN by adding phased array antennas, which would allow communication with multiple satellites at once.

## FALSE AND MISLEADING STATEMENTS

***June 24, 2025 Financial Reports***

95. On June 24, 2025, during post-market hours, the Company issued the FY 2025 Earnings Release announcing AeroVironment's financial and operating results for the fourth quarter and full year for FY 2025. The FY 2025 Earnings Release included the Company's potential projected results for FY 2026, stating, in relevant part:

> ***For fiscal year 2026*** inclusive of the projected results of the BlueHalo acquisition, which closed May 1, 2025, ***the Company expects revenue of between $1.9 billion and $2.0 billion***, non-GAAP adjusted EBITDA of between $300 million and $320 million, ***and non-GAAP earnings per diluted share***, which excludes amortization of intangible assets, other non-cash purchase accounting expenses and equity securities investments gains or losses, ***of between $2.80 and $3.00.***

96. That same day, the Company held an earnings call to discuss the financial results released in the FY 2025 Earnings Release (the "FY 2025 Earnings Call"). During the FY 2025 Earnings Call, Defendant Nawabi stated that "recently the U.S. Department of Defense reiterated the importance our solutions and capabilities play in national defense strategy from precision fires and loitering munitions, autonomous counter UAS and to space technologies, cybersecurity solutions, and advanced munitions."

97. Later, during the FY 2025 Earnings Call, Defendant Nawabi claimed that the Company was "positioned very, very well in" various categories, including "space communications." Defendant Nawabi continued, stating that the SCAR program was one of "several very serious large growth potential opportunities in front of us," and that AeroVironment "won" the SCAR contract. Specifically, Defendant Nawabi stated, "It's worth about a $1.7 billion program funded through the Congressional budget documents. We can scale that and expedite deliveries in the fiscal year 2026 and beyond."

98. Additionally, on the FY 2025 Earnings Call, Defendant McDonnell assured investors that "[o]ur visibility to the midpoint of the revenue guidance range is at 70%," noting that that figure included BlueHalo.

99. The statements referenced above in ¶¶95-98 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia,* that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated. As a result of the foregoing, the Individual

Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***August 13, 2025 Proxy Statement***

100. On August 13, 2025, the Company filed the 2025 Proxy Statement with the SEC. Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

101. The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Muller, Burbage, Wodlinger, and Albers as Class I directors for a one-year term expiring at the 2026 Annual Meeting of Stockholders; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for FY 2026; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the Amended and Restated 2021 Equity Incentive Plan (the "Restated 2021 Plan").

102. The 2025 Proxy Statement noted that if AeroVironment shareholders voted to approve the Restated 2021 Plan, it would become effective immediately. Additionally, the 2025 Proxy Statement stated that, if approved, the Restated 2021 Plan will cause an additional 1,200,000 shares of the Company's common stock to be made available for issuance. Per the 2025 Proxy Statement, as of July 22, 2025, there were 621,582 shares still available for grant under the 2021 Equity Incentive Plan (the "2021 Plan"), meaning that if the Restated 2021 Plan is approved, there would be a total of 1,821,582 shares available for grant. The 2025 Proxy Statement states that employees, consultants, directors, and employees and consultants of the Company's subsidiaries are eligible to participate in the Restated 2021 Plan. It further notes that if the Restated 2021 Plan

was not approved, the existing 2021 Plan would "continue in full force and effect" and the Company "may continue to grant awards under the [2021] Plan . . . using the shares available for issuance thereunder."

103. Regarding the "Board Leadership Structure," the 2025 Proxy Statement stated:

> We do not have a formal policy regarding the separation of the roles of Chairman of the Board and Chief Executive Officer. The company's governance framework provides the board with flexibility to select the appropriate leadership structure for long-term success of the company. In making leadership structure determinations, including whether to separate or combine the Chairman of the Board and Chief Executive Officer roles, the board considers many factors, including the specific needs of the business and what is in the best interests of the company's stockholders.
>
> Our current leadership structure is as follows:
>
> - Chairman of the Board, President and Chief Executive Officer: Wahid Nawabi
> - Lead Independent Director: Edward R. Muller
> - Committees led by independent directors
> - Active engagement by all directors
>
> The board believes that this leadership structure, consisting of a combined Chairman of the Board and Chief Executive Officer, an independent director serving as Lead Independent Director and strong, active independent directors, is the optimal structure to guide our company and maintain the focus required to achieve our business goals. The board believes this structure provides an effective balance between strong company leadership and appropriate safeguards and oversight by independent directors. It provides a single leader who is understood by our employees, customers, business partners, and stockholders as providing strong leadership for the company, which enhances our ability and agility to manage resources and provides the focus required to implement our complex business strategy.

104. Regarding the "Board's Role in Risk Oversight," the 2025 Proxy Statement stated:

> Our board of directors is responsible for overseeing our risk management and delegates many of these functions to the Audit and Cybersecurity Committees, which report regularly to the board. Under its charter, the Audit Committee is responsible for discussing with management the company's policies with respect to risk assessment and risk management. The committee is chartered to discuss with management our significant risk exposures and the actions management has taken to limit, monitor or control such exposures. Under its charter, the Cybersecurity Committee is responsible for reviewing, discussing, and making recommendations to the full board of directors regarding cybersecurity matters, including cyber risks.

> In addition to the Audit and Cybersecurity Committees' work in overseeing risk management, our full board engages in discussions of the most significant risks that we face and how these risks are being managed. Our Compensation and Nominating and Corporate Governance Committees are also involved in evaluating risks that fall within the purview of those committees' responsibilities.

105. Regarding the Company's Code of Ethics, the 2025 Proxy Statement stated:

> Our Amended & Restated Code of Business Conduct and Ethics ("code of conduct"), is our code of ethics for directors, executive officers, employees and agents. Any amendment to the code of conduct that applies to our directors or executive officers may be made only by the board or a board committee and will be disclosed on our website.
>
> The code of conduct is available at http://investor.avinc.com. The Audit Committee charter and the code of conduct are also available in print to any stockholder who requests them.

106. Regarding the Company's Audit Committee, the 2025 Proxy Statement stated that the Audit Committee is responsible for the following:

- selecting and hiring our independent registered public accounting firm;
- evaluating the qualifications, independence and performance of our independent registered public accounting firm;
- reviewing and approving the audit and non-audit services to be performed by our independent registered public accounting firm;
- reviewing the design, adequacy, implementation and effectiveness of our internal controls established for finance, accounting, legal compliance and ethics;
- reviewing the design, adequacy, implementation and effectiveness of our critical accounting and financial policies;
- overseeing and monitoring the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to financial statements or accounting matters;
- reviewing with management and our independent registered public accounting firm our annual and quarterly financial statements;
- reviewing with management and our independent registered public accounting firm any earnings announcements or other public announcements concerning our operating results;

- establishing procedures for the receipt, retention and treatment of complaints (including procedures for receiving and handling complaints on a confidential and anonymous basis) regarding accounting, internal accounting controls or auditing matters, including employee concerns regarding questionable accounting or auditing matters;

- preparing the audit committee report that the SEC requires in our annual proxy statements; and

- reviewing and approving any related party transactions.

107. Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

108. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

109. As a result of Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger causing the 2025 Proxy Statement to be false and misleading, the Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Muller, Burbage, Wodlinger, and Albers as Class I directors for a one-year term expiring at the 2026 Annual Meeting

of Stockholders, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for FY 2026; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the Restated 2021 Plan.

110. As a result of shareholders approving the Restated 2021 Plan, the plan took effective immediately upon reaching shareholder approval on September 25, 2025. An additional 1,200,000 shares were made available for grant, meaning there were 1,821,582 shares available for issuance under the Restated 2021 Plan. The Individual Defendants, most of whom are directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the Restated 2021 Plan. Moreover, the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the Restated 2021 Plan in the future.

***September 9, 2025 Earnings Release***

111. On September 9, 2025, the Company issued a press release announcing AeroVironment's financial results for the first quarter of FY 2026 (the "1Q 2026 Earnings Release"). The 1Q 2026 Earnings Release provided investors with an update on the Company's FY 2026 guidance, including information on revenue and improved projections as to non-GAAP earnings per share, stating, in relevant part:

> ***For fiscal year 2026, the Company continues to expect revenue of between $1.9 billion and $2.0 billion***, net loss of between $(77) million and $(72) million, non-GAAP adjusted EBITDA of between $300 million and $320 million, loss per diluted share of between $(1.63) and $(1.53) ***and non-GAAP earnings per diluted share***, which excludes amortization of intangible assets, other non-cash purchase accounting expenses and equity securities investments gains or losses, ***of between $3.60 and $3.70.***

***September 9, 2025 Earnings Call***

112. Later that same day, the Company hosted an earnings call to address the financial results announced in the 1Q 2026 Earnings Release (the "1Q 2026 Earnings Call").

113. During the 1Q 2026 Earnings Call, Defendant Nawabi noted the Company's confidence that AeroVironment's BADGER systems, the product involved in the U.S. Space Force contract, "will be key growth drivers . . . in the future," stating, in relevant part:

> Now on to our second segment, Space, Cyber and Directed Energy, or SCDE segment. Our SCDE segment posted first-quarter revenues of $169 million. Our Space Technologies and directed energy solutions will continue to drive growth in this segment and for the company. As I mentioned earlier, we announced yesterday a $240 million contract award for our long-haul space laser communication system. In addition to anticipated revenue growth from this area, ***we're confident that our BADGER phased array solution and our Counter-UAS directed energy solutions, LOCUST, will be key growth drivers for this segment in the future.***

114. Defendant McDonnell later expanded on Defendant Nawabi's remarks regarding the Company's projected financial performance as related to gross margins, stating, in relevant part:

> First year — first quarter adjusted gross margins were 29% versus 45% in the first quarter of FY '25. As noted, the business landscape of the combined new company has changed significantly with a higher service mix and several products in early stages of maturation. We believe adjusted gross margins should continue to improve throughout the year, ending up in the mid-30s by Q4 with an average for the year in the low 30s.

115. Later, during the question-and-answer portion of the 1Q 2026 Earnings Call, Defendant Nawabi responded to an analyst's question concerning the Company's FY 2026 guidance of $1.9 to $2.0 billion, stating, in relevant part:

> There's only so much planning and at risk that we can go given the situation that we're in right now. So for that reason, ***I would say we feel very strong about our current guidance***. Some of that OBD dollars is baked into our guidance and our expectations, but some of it's not. And then every day that goes by, by the budgets not being approved or a continuing resolution going forward or the dollars not hitting their accounts, it could actually — it actually adds more risk for that not to happen this year, but it will happen the following year. ***Regardless, we're going to have a great year***, and we're going to most likely going to finish the year strong with a very strong pipeline in bookings that can set us up for even more success

beyond fiscal '26.

***September 30, 2025 Investor Open House***

116. On September 30, 2025, the Company held its Investor Open House, where investors were provided with updates on AeroVironment's business strategies, defense technologies, and its contract with the U.S. Space Force.

117. Specifically, during the Investor Open House, Defendant Nawabi emphasized to investors the importance of the SCAR program and the Company's BADGER product that AeroVironment was contracted to deliver to the U.S. Space Force, stating, in relevant part:

> One of our very old investor — old many long-term investors asked me a question last night. It was a very good question actually. It's a question that I asked myself a lot. And it was 'Wahid, what are you most excited about?' So this is all great, and I'll give you the top 10 list. . . . ***SCAR and our BADGER space comms is really key. That's a $1 billion franchise.***

118. Additionally, during the Investor Open House, Defendant Clum noted the close communication between the Company and the U.S. Space Force, representing that the U.S. Space Force was "asking for more" products from the Company, which AeroVironment was ready to provide, stating, in relevant part:

> So let's start with our first technology you're going to see in Albuquerque, our BADGER. Here's an example of BADGER right here. ***We're going to highlight a program win***. That's the Satellite Control Augmentation Resource program, or SCAR***. It's an awarded value of $1.7 billion, extending all the way through '23 — 2030. But what set us apart — it's what Wahid he told you. It was not size. It's the way we work. We put our entire team shoulder to shoulder with the customer. We listen, we adapt and we designed with them. So SCAR's a program locked in, in a very high barrier to entry market. [B]ut our team did it. And what's our customer saying, I'm going to quote him.*** And I want to pause on this a little bit because it emphasizes that demand and urgency that the [S]pace [F]orce has. So in June of 2025, Breaking defense quoted Dr. Kelly Hammett, he's the Director of the Space Force Rapid Capabilities Office. He said, and I'm going to read his quote. ***We're going to need a bunch of SCARs, and we're going to need them fast as we can make them. . . . We're ready to scale***. You're going to see this. Our whole facility is outfitted with full test automation and the manufacturing is underway in the first deliveries this year. ***So the customer is asking for more. We're ready to build more.*** But rather than making me describe it, let's see

BADGER in action.

***December 3, 2025 Goldman Sachs' Industrial and Materials Conference***

119. On December 3, 2025, Defendant Nawabi presented on behalf of AeroVironment in the Goldman Sachs' Industrial and Materials Conference (the "Goldman Sachs Conference"). During the Goldman Sachs Conference, Defendant Nawabi expressed his confidence that SCAR and the Company's BADGER product will be "major contributors to [AeroVironment's] growth," stating, in relevant part:

> Our strategy fundamentally is we're going after very large categories that we can disrupt and be the leader and innovate and have high growth and high value creation. . . . Each one of these opportunities is $1 billion, slightly less than $1 billion or a couple of plus billion dollars large. . . . ***In some cases, we're the only player. Like SCAR, as Kevin mentioned, we've been already selected***. So which one is going to happen when is incredibly difficult to predict in terms of timing. That's the fundamental reason why we don't provide that level of granularity because it is really difficult to be able to time that from the customers' behavior and processes. . . . Now having said that, these are ***-- there are certain areas that I can very confidently think that over the next several years, it's going to be major contributors to growth*** . . . . So the best way to look at it is, you can decide which one you think is going to happen, but I can give you a basket of things that's going to contribute to the growth. . . . ***The other area is SCAR and BADGER. That's a program that we've won. It's $1.7 billion worth of funding that's going to be put into that to modernize the entire U.S. space satellite, geosynchronous satellites with our systems phased arrays.***

***December 9, 2025 Earnings Call***

120. On December 9, 2025, the Company announced its results for the second quarter of FY 2026 and later held an earnings call to discuss the released financial results (the "2Q 2026 Earnings Call").

121. During the 2Q 2026 Earnings Call, Defendant Nawabi once again touted the SCAR program as a "tremendous growth opportunity," stating, in pertinent part:

> [AeroVironment] won several key awards in our Space, Cyber and Directed Energy segment with critical new contracts in Laser Communications, Space-related Satellite Communications and Directed Energy. . . . ***[AeroVironment] secured a new firm fixed price option for 2 BADGER phased array systems under the SCAR***

> ***or Satellite Communication Augmentation Resource program. This program represents a tremendous growth opportunity for [AeroVironment] as more BADGER systems move into production.***

122. Further, during the 2Q 2026 Earnings Call, Defendant McDonnell echoed Defendant Nawabi's confidence in SCAR, stating, in relevant part:

> The space and directed energy products grew more than 20% in the quarter versus the prior year, with the LOCUST Directed Energy Counter-UAS growth being one of the key drivers. ***As Wahid mentioned earlier, this segment also received several large contracts this past quarter to include a significant contract for our long-haul laser communications and 2 BADGERS for the U.S. Space Force's SCAR program.***

123. During the question-and-answer portion of the 2Q 2026 Earnings Call, Defendant Nawabi addressed an analyst's question regarding the U.S. Space Force contract. Specifically, Defendant Nawabi provided an update on the Company's work progress and its projected revenue for FY 2026, stating, in relevant part:

> [A]s I mentioned in my remarks, we did secure an additional task order and award from the U.S. Space Force for additional BADGERS — 2 more additional BADGERS. The whole SCAR program, as we mentioned in our comments before, has been so far in a customer-funded development process. ***We're shifting now from development activity to delivering products,*** most of which is going to end up eventually going into our firm fixed price contracts. ***That transition not only ramps up the revenue for the second half of the year, but also improves the margin profile of that business. So we're very much on track with our plans. We're pleased with the performance so far, and we expect the margins as well as the revenue of that business to actually improve in the third and fourth quarter of this year and continue to improve beyond this fiscal year.***

124. In response to a different analyst's question, Defendant Nawabi affirmed the Company's confidence in its FY 2026 guidance, particularly noting AeroVironment's confidence in its expected contracts and awards, such as the SCAR program, stating, in pertinent part:

> [W]e are expecting and we're expecting multiple task orders and orders on the second half that we believe we're going to be able to convert that to revenue. In order for us to overperform is going to be more difficult because of the timing, how long it takes to go build those products, get them tested and accepted by the customer and then deliver to our customers. ***So we're confident about our full year guidance, number one. Number two, we do expect contract awards and task***

> ***orders in the second half that will convert to revenue and that's part of our forecast, and we're confident that we can achieve that. . . . [I]t's a very nice, nice portfolio or basket of contracts and awards that we expect.*** It's basically the critical areas that the U.S. DoD needs them desperately and we've been talking about. So P550, more Switchblade, more One-Way Attack, more Counter-UAS, more Directed Energy***, more SCAR and BADGERS***. And ***those are the key areas that we expect more of in our second half of the year.***

125. The statements referenced above in ¶¶111-124 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**<u>THE TRUTH BEGINS TO EMERGE AS THE FALSE AND MISLEADING STATEMENTS CONTINUE</u>**

***January 20, 2026 Form 8-K***

126. The truth began to emerge on January 20, 2026, when the Company filed the January 2026 8-K. The January 2026 8-K announced that on January 16, 2026, upon mutual agreement, "the U.S. Government issued a stop work order on the Company's . . . Agreement for the delivery of BADGER phased array antenna systems to support the [SCAR] program."

127. On this news, the price of the Company's stock fell $61.97 per share, or approximately 15.8%, from a closing price of $392.86 on January 16, 2026, to close at $330.89 per share on January 20, 2026. However, the Individual Defendants continued to conceal the full truth regarding the Company's likelihood and extent of continued revenue from the SCAR program.

128. For example, the January 2026 8-K stated that the "stop work order allows for the parties to negotiate an amended agreement for the future of the SCAR program under new requirements for the program," which AeroVironment "expected to be a firm-fixed price agreement." Further, the January 2026 8-K noted that the "Company expects to continue to deliver capabilities and products for the SCAR program."

129. The statement referenced above in ¶128 was materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia,* that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***March 2, 2026 Space News Report***

130. The truth continued to emerge when, on March 2, 2026, *Space News* reported that the U.S. Space Force was "reassessing how to move forward" with the SCAR program and was opening the SCAR program to different suppliers than AeroVironment. Colonel Owen Stevens, the director of contracting at the U.S. Space Force's RCO, who supervised SCAR, was quoted in the *Space News* report as stating "We have been in conversations with the SAE [senior acquisition executive] ***for a little while now***, and we are going to move into a new acquisition strategy for SCAR."

131. Additionally, Colonel Stevens stated "[t]hat new acquisition strategy will likely take the form of ***other companies building versions or variants of SCAR***," and that the U.S. Space Force "will most likely introduce other vendors into the mix," thus signaling the U.S. Space

Force's decision to work with more than one contractor.

132. On this news, the price of the Company's stock fell $43.93 per share, or approximately 17.4%, from a closing price of $252.25 on February 27, 2026, to close at $208.32 per share on March 2, 2026. However, the Individual Defendants continued to conceal the full truth regarding the Company's likelihood and extent of continued revenue from the SCAR program.

***March 2, 2026 Citizens Technology Conference***

133. For example, on March 2, 2026, Defendant McDonnell participated in a fireside chat at the Citizens Technology Conference (the "Citizens Conference"). During the Citizens Conference, Defendant McDonnell was asked about the SCAR program and the *Space News* report released earlier that day, to which Defendant McDonnell responded, in relevant part:

> [W]e have a fixed price and a set delivery schedule and all the things that comes with that, and that's the process we're in now of negotiating that go-forward contract.
>
> ***
>
> We didn't cancel the contract. We're still on the program. We still have a contract.

134. Moreover, in response to the news that the Space Force was soliciting proposals from other vendors, Defendant McDonnell claimed that "we're multiple years ahead of any particular competitors in the market. So, it's a little bit of a game of them trying to make us go faster, I think."

***March 3, 2026 Press Release***

135. Further, on March 3, 2026, the Company issued a press release titled "AV Issues Statement Regarding Active Negotiations for Contract Amendment to Support U.S. Space Force's SCAR Program" (the "March 2026 Press Release").

136. The March 2026 Press Release addressed the purported ongoing negotiations for

the SCAR program with the U.S. Space Force, stating, in relevant part:

> ***We remain in active negotiations with the U.S. Space Force regarding AV's contract to deliver ground stations to support the SCAR program.*** AV appreciates that ***the contract was temporarily paused while both parties work together on a firm-fixed-price contract that provides a commercialized product solution with an expedited delivery timeline.*** AV is focused on aligning to customer needs and, as separately announced, is actively investing in expanding manufacturing capacity in Albuquerque, New Mexico to support growth in our Space and Directed Energy platforms, including manufacturing for the SCAR program. AV's innovation and ability to scale ahead of manufacturing remains a key differentiator, giving us a competitive edge in the broader defense market. ***AV is confident in its ability to successfully deliver our systems ahead of competitors.***

137. The statements referenced above in ¶¶133-136 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia,* that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***March 10, 2026 Earnings Release***

138. The truth continued to emerge on March 10, 2026, when the Company issued the 3Q 2026 Earnings Release. The 3Q 2026 Earnings Release reported a third-quarter FY 2026 operating loss of $179 million, compared to an operating loss of $3.1 million for the third quarter of FY 2025. The 3Q 2026 Earnings Release noted that the "decrease year-over-year was primarily due to the goodwill impairment of $151.3 million" in the AeroVironment's space division after the stop work order related to the U.S. Space Force's SCAR program.

139. Further, the 3Q 2026 Earnings Release provided an updated outlook for FY 2026,

announcing that "the Company now expects a revenue of between $1.85 billion and $1.95 billion," compared to its previous FY 2026 guidance range of $1.95 billion to $2.0 billion.

140. On this news, the price of the Company' stock fell $13.84 per share, or approximately 6.2%, from a closing price of $221.57 on March 10, 2026, to close at $207.73 per share on March 11, 2026. However, the Individual Defendants continued to conceal the full truth regarding the Company's likelihood and extent of continued revenue from the SCAR program.

***March 10, 2026 Earnings Call***

141. For example, that same day, the Company hosted the 3Q 2026 Earnings Call to address the 3Q 2026 Earnings Release financial results. During the 3Q 2026 Earnings Call, despite revealing that the U.S. Space Force terminated the $1.7 billion contract with the Company, Defendant Nawabi claimed that AeroVironment "remain[s] in active discussions with the U.S. Space Force regarding . . . BADGER," stating, in relevant part:

> We remain in active discussions with the U.S. Space Force regarding the BADGER phased array antenna system to support the SCAR or Satellite Communication Augmentation Resource program. We appreciate that the contract was temporarily paused while we work together on a firm fixed price contract that provides a commercialized product solution**. *As of this morning, we could not come to a mutually acceptable agreement with our customer to modify the existing contract and resume work. Therefore, the U.S. Space Force has concluded to terminate our existing contract for convenience, pay us for our allowable incurred cost with a fee and enable AV to recompete for the program*** with their revised requirements and our proposed solution.

142. Later, during the 3Q 2026 Earnings Call, Defendant McDonnell addressed the connection between the SCAR stop work order and the Company's updated, lower FY 2026 guidance, stating, in pertinent part:

> ***The well-publicized stop work order for the SCAR program did have a negative impact on the quarter and this is in part the reason we are lowering our full-year guidance. This resulted in a noncash $151 million goodwill impairment*** as the evaluation of the acquired asset, the space business, ***was triggered by the SCAR stop-work order.*** The reevaluation resulted in a reduction in the acquisition date

> value of the acquired space business of approximately 17%. ***We do not expect any further adjustments to the impairment as a result of the notification of the customer to terminate the contract for convenience.***

143. On the 3Q 2026 Earnings Call, Defendant McDonnell also detailed the impact that the termination of the SCAR program contract will have on the Company's financial results, stating, in relevant part:

> We ended the quarter with $1.1 billion of funded backlog and approximately $3 billion of unfunded backlog***. I should note that approximately $1.5 billion of the unfunded backlog relates to the SCAR program*** for which we were under contract at the end of the quarter. ***We expect an adjustment to the unfunded backlog as a result of the intent of the customer to terminate*** for convenience and the resolution of the customer's obligations under the current contract.

***March 11, 2026 10-Q***

144. Additionally, on March 11, 2026, the Company filed its quarterly report on Form 10-Q with the SEC for the third quarter of FY 2026 (the "3Q 2026 10-Q"). The 3Q 2026 10-Q was signed by Defendants Nawabi and McDonnell and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Nawabi and McDonnell attesting to the accuracy of the 3Q 2026 10-Q and stating that "as of January 31, 2026, the end of the period covered by this Quarterly Report on Form 10-Q, ***our disclosure controls and procedures were effective and were operating at a reasonable assurance level***."

145. The 3Q 2026 10-Q provided that the goodwill impairment for the third quarter was $151.3 million, and that AeroVironment's goodwill balance on January 31, 2026, was $2.46 billion.

146. The statements referenced above in ¶¶141-145 were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia,* that: (1) the

Company's goodwill impairment charge to the Space reporting unit was understated; and (2) the Company's disclosure controls and procedures were materially deficient. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH FULLY EMERGES

147. The truth fully emerged on June 22, 2026, when the Company issued the June 2026 8-K, which announced that AeroVironment's financial statements filed in the 3Q 2026 10-Q "require restatement and should no longer be relied upon" because the goodwill impairment calculation was grossly understated.

148. Further, the June 2026 8-K reported that the impairment charge had been understated by $89.4 million, thus bringing the correct goodwill impairment total charge to $240.7 million. The June 2026 8-K attributed this to "an error in the calculation of the carrying value used in the goodwill impairment analysis of the Space reporting unit."

149. The June 2026 8-K also disclosed that the error and the related restatements were the result of a newly identified material weakness in the Company's internal control over financial reporting," and that "the disclosure controls and procedures as of January 31, 2026 were ineffective."

150. On this news, the price of the Company' stock fell $18.28 per share, or approximately 10.8%, from a closing price of $169.61 on June 18, 2026, to close at $151.33 per share on June 22, 2026.

## DAMAGES TO AEROVIRONMENT

151. As a direct and proximate result of the Individual Defendants' conduct, AeroVironment will lose and expend many millions of dollars.

152. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgments associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

153. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

154. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

155. Additionally, these expenditures include, but are not limited to, unjust compensation and benefits provided to the Individual Defendants who breached their fiduciary duties to the Company, as well as proceeds obtained through improper lucrative insider trading conducted by three of the Individual Defendants.

156. As a direct and proximate result of the Individual Defendants' conduct, AeroVironment has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

157. Plaintiff brings this action derivatively and for the benefit of AeroVironment to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of

their fiduciary duties as directors and/or officers of AeroVironment, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

158. AeroVironment is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

159. Plaintiff is, and has been at all relevant times, a shareholder of AeroVironment. Plaintiff will adequately and fairly represent the interests of AeroVironment in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

160. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

161. A pre-suit demand on the Board of AeroVironment is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Nawabi, Burbage, Davidson, Lewis, Long, Muller, Page, and Votel (the "Director-Defendants") and non-party William J. Lynn, III. Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time of the filing of this complaint.

162. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

163. In complete abdication of their fiduciary duties, the Director-Defendants either

knowingly or recklessly caused or permitted the Company to issue the materially false and misleading statements alleged herein. Specifically, the Director-Defendants caused AeroVironment to issue false and misleading statements which were intended to make AeroVironment appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

164. In addition, the Director-Defendants caused the 2025 Proxy Statement to call for a shareholder vote to approve the Restated 2021 Plan, which increased the amount of shares available under the 2021 Plan by 1,200,000 shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the Restated 2021 Plan, which they would not have approved had they been informed about the Individual Defendants' misconduct. Prior to the Company's 2025 Annual Meeting of Stockholders on September 25, 2025, there were 621,582 shares available for distribution under the 2021 Plan. After the shareholders voted to approve the Restated 2021 Plan, there were an additional 1,200,000 shares available for issuance under the Restated 2021 Plan. Thus, the Individual Defendants received material personal benefits that they otherwise would not receive but for the issuance of the false and misleading 2025 Proxy Statement and the shareholders approving the Restated 2021 Plan. For these reasons too, demand on the Director-Defendants in futile and, therefore, excused.

165. Additional reasons that demand on Defendant Nawabi is futile follow. Defendant Nawabi has served as CEO and President, and as a Company director since May 2016. He also serves on the Executive Committee. Further, Defendant Nawabi has previously worked in various positions at the Company since December 2011. As such, the Company provides Defendant

Nawabi with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made some of the false and misleading statements alleged herein. Defendant Nawabi also signed the false and misleading 3Q 2026 10-Q. Furthermore, Defendant Nawabi's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein further demonstrate his motive in facilitating and participating in the scheme. Defendant Nawabi also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Albers, Burbage, Muller, and Wodlinger as Class I directors, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the Restated 2021 Plan. Additionally, under the Restated 2021 Plan, Defendant Nawabi is eligible to receive stock awards, thereby materially benefiting from the adoption of the Restated 2021 Plan. Moreover, Defendant Nawabi is named as a defendant in the Securities Class Action. For these reasons, Defendant Nawabi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166. Additional reasons that demand on Defendant Burbage is futile follow. Defendant Burbage has served as a Company director since 2013. Defendant Burbage also currently serves as the Chairperson of the Compensation Committee, and as a member of both the Nominating and Corporate Governance Committee and the Executive Committee. Defendant Burbage has received

and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Burbage also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Albers, Muller, and Wodlinger as Class I directors, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the Restated 2021 Plan. Additionally, under the Restated 2021 Plan, Defendant Burbage is eligible to receive stock awards, thereby materially benefiting from the adoption of the Restated 2021 Plan. For these reasons, Defendant Burbage breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

167. Additional reasons that demand on Defendant Davidson is futile follow. Defendant Davidson has served as a Company director since June 2023. Additionally, Defendant Davidson serves as a member of both the Audit Committee and the Cybersecurity Committee. Defendant Davidson has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Davidson also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Albers, Burbage, Muller, and Wodlinger as Class I directors, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the Restated 2021

Plan. Additionally, under the Restated 2021 Plan, Defendant Davidson is eligible to receive stock awards, thereby materially benefiting from the adoption of the Restated 2021 Plan. For these reasons, Defendant Davidson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on Defendant Lewis is futile follow. Defendant Lewis has served as a Company director since 2021, including as the Chairperson of the Cybersecurity Committee and as a member of the Audit Committee. Defendant Lewis has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant Lewis also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Albers, Burbage, Muller, and Wodlinger as Class I directors, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the Restated 2021 Plan. Additionally, under the Restated 2021 Plan, Defendant Lewis is eligible to receive stock awards, thereby materially benefiting from the adoption of the Restated 2021 Plan. For these reasons, Defendant Lewis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Long is futile follow. Defendant Long has served as a Company director since August 2023, including as a member of both the Nominating and Corporate Governance Committee and the Cybersecurity Committee. Defendant

Long has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Long also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Albers, Burbage, Muller, and Wodlinger as Class I directors, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the Restated 2021 Plan. Additionally, under the Restated 2021 Plan, Defendant Long is eligible to receive stock awards, thereby materially benefiting from the adoption of the Restated 2021 Plan. For these reasons, Defendant Long breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

170. Additional reasons that demand on Defendant Muller is futile follow. Defendant Muller has served as a Company director since 2013. Further, Defendant Muller serves as the Chairperson of the Audit Committee, and as a member of both the Compensation Committee and the Executive Committee. Defendant Muller has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Defendant Muller also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and Defendants Albers, Burbage, and Wodlinger as Class I directors, allowing them to continue to breach their fiduciary duties to the Company, and the

approval of the Restated 2021 Plan. Additionally, under the Restated 2021 Plan, Defendant Muller is eligible to receive stock awards, thereby materially benefiting from the adoption of the Restated 2021 Plan. For these reasons, Defendant Muller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171. Additional reasons that demand on Defendant Page is futile follow. Defendant Page has served as a Company director since 2013 and currently serves as the Chairperson of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Page has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Page's insider sales while the Company's stock price was artificially inflated as a result of the false and misleading statements herein further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Page also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Albers, Burbage, Muller, and Wodlinger as Class I directors, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the Restated 2021 Plan. Additionally, under the Restated 2021 Plan, Defendant Page is eligible to receive stock awards, thereby materially benefiting from the adoption of the Restated 2021 Plan. For these reasons, Defendant Page breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on Defendant Votel is futile follow. Defendant Votel has served as a Company director since November 2023. Defendant Votel currently serves as a member of both the Compensation Committee and the Cybersecurity Committee. Defendant Votel has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Votel also solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of Defendants Albers, Burbage, Muller, and Wodlinger as Class I directors, allowing them to continue to breach their fiduciary duties to the Company, and the approval of the Restated 2021 Plan. Additionally, under the Restated 2021 Plan, Defendant Votel is eligible to receive stock awards, thereby materially benefiting from the adoption of the Restated 2021 Plan. For these reasons, Defendant Votel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173. Additional reasons that demand on the Board is futile follow.

174. Defendants Muller (as Chair), Davidson, Lewis, and Page (the “Audit Committee Defendants”) served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company’s internal controls, the truth and accuracy of the Company’s financial statements, and the Company’s compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants’ violations of law, including

breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

175. In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

176. AeroVironment has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for AeroVironment any part of the damages AeroVironment suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

177. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

178. The acts complained of herein constitute violations of fiduciary duties owed by AeroVironment's officers and directors, and these acts are incapable of ratification.

179. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of AeroVironment. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of AeroVironment, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

180. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause AeroVironment to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile

in that event, as well.

181. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger for Violations of Section 14(a) of the Exchange Act**

182. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

184. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

185. Under the direction and watch of Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger, the 2025 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such

waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

186. Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; and (2) as a result, the Company's potential business and financial prospects was overstated. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

187. Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors and the approval of the Restated 2021 Plan.

188. As a result of Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger causing the 2025 Proxy statement to be false and misleading, at the 2025 Annual Meeting of the Stockholders, Company shareholders voted, *inter alia*, to approve the Restated 2021 Plan, and to re-elect Defendants Albers, Burbage, Muller, and Wodlinger as Class I directors, thereby allowing them to continue breaching their fiduciary duties to the Company.

189. The Company was damaged as a result of Defendants Nawabi, Albers, Burbage, Davidson, Lewis, Long, Muller, Page, Votel, and Wodlinger's material misrepresentations and omissions in the 2025 Proxy Statement.

190. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

191. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AeroVironment's business and affairs.

193. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

194. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AeroVironment.

195. In breach of their fiduciary duties owed to AeroVironment, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the risk of imminent competition from other vendors for the SCAR program and the U.S. Space Force's ongoing efforts to modernize the SCN was understated; (2) as a result, the Company's potential business and financial prospects was overstated; (3) the Company's goodwill impairment charge to the Space reporting unit was understated; and (4) the Company's disclosure controls and procedures were materially deficient. As a result of the foregoing, the Individual Defendants caused the Company's

public statements to be materially false and misleading at all relevant times. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

196. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

197. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

198. In yet further breach of their fiduciary duties, during the Relevant Period, three of the Individual Defendants engaged in lucrative insider sales while the Company's stock price was artificially inflated before the fraud was exposed, netting total proceeds of approximately $6.8 million.

199. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AeroVironment's securities.

200. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was

engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AeroVironment's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

201. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

202. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AeroVironment has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

203. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

## THIRD CLAIM
## Against the Individual Defendants for Unjust Enrichment

204. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

205. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AeroVironment.

206. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from AeroVironment that was tied to the performance or artificially inflated valuation of AeroVironment or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

207. Plaintiff, as a shareholder and a representative of AeroVironment, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

208. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

209. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AeroVironment, for which they are legally responsible.

211. As a direct and proximate result of the Individual Defendants' abuse of control, AeroVironment has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, AeroVironment has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

212. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

213. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of AeroVironment in a manner consistent with the operations of a publicly held corporation.

215. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AeroVironment has sustained and will continue to sustain significant damages.

216. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

217. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

## SIXTH CLAIM
## Against the Individual Defendants for Waste of Corporate Assets

218. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

220. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused AeroVironment to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

221. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

222. Plaintiff, on behalf of AeroVironment, has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Nawabi, McDonnell, and Clum for Contribution Under Sections 10(b) and 21D of the Exchange Act**

223. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224. AeroVironment and Defendants Nawabi, McDonnell, and Clum are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Nawabi, McDonnell, and Clum's willful and/or reckless violations of their obligations as officers and/or directors of AeroVironment.

225. Defendants Nawabi, McDonnell, and Clum, because of their positions of control and authority as officers and/or directors of AeroVironment, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of AeroVironment, including the wrongful acts complained of herein and in the Securities Class Action.

226. Accordingly, Defendants Nawabi, McDonnell, and Clum are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

227. As such, AeroVironment is entitled to receive all appropriate contribution or indemnification from Defendants Nawabi, McDonnell, and Clum.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of AeroVironment, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to AeroVironment;

(c) Determining and awarding to AeroVironment the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing AeroVironment and the Individual Defendants to take all necessary actions to reform and improve AeroVironment's corporate governance and internal procedures to comply with applicable laws and to protect AeroVironment and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of AeroVironment to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding AeroVironment restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 27, 2026

Respectfully submitted,

**SPIRO & BROWNE, PLC**

*/s/ David G. Browne*
David G. Browne (VSB No. 65306)
2400 Old Brick Road
Glen Allen, VA 23060
Telephone: (804) 573-9220
Facsimile: (804) 836-1855
Email: dbrowne@sblawva.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net